Judge Marshall
delivered the Opinion of the Court.
In 1817, upon a partial division of the lands formerly belonging to Andrew Hynes—who died in the year 1800—thirty acres, situated in the county of Nelson, (being considered as land not specifically devised by him,) were allotted to Armstead, Andrew and Eliza H. *450 Churchill, in right of their mother, Sarah Churchill, deceased, who was one of his children and devisees, among whom he directed his residuary lands to be equally divided.
In 1818, John Shalley purchased the thirty acres, at the price of six hundred and sixty dollars, and received a deed purporting to convey the whole in the names of the three Churchills, and to be executed by them. But Eliza H. Churchill (of whose execution of the deed there is no proof, except the fact that her name is signed to it as one of the grantors,) being then an infant, he also took the bond of one or both of her brothers, conditioned for securing a conveyance or confirmation from her when she should arrive at full age. Under this purchase, Shalley took possession of the thirty acres, and he, or those claiming under him, have held it ever since.
In 1830, previous to which time Henry Gore had become the proprietor—without warranty—of the whole of John Shalley’s interest in the thirty acres and other adjacent land, Eliza H. Churchill, being then of full age, conveyed her undivided interest in the thirty acres to Isaac Shalley (a son of John) for the consideration of fifty dollars. And thereupon, Isaac Shalley filed this bill against Gore, for a division of the land, and for general relief. This is resisted by Gore, (1.) on the ground that the land never belonged to the Churchills, having been, as he alleges, devised by Andrew Hynes to his son Alfred W. Hynes, from whom he exhibits a deed, made upon the nominal consideration of one dollar, and dated a few days after the deed from E. H. Churchill to the complainant; and (2.) on the ground that this deed rto the complainant was obtained by the fraudulent procurement of John Shalley, and under the mistaken supposition on the part of the grantor, that it was in confirmation of the sale made by her brothers. And he prays, by way of cross-bill, that the complainant may convey to him, &c.
Several amended bills were filed, and answered. The executors, heirs and devisees of Andrew Hynes were made defendants by the complainant, and the entire record of a suit in chancery between them, in which the *451 division of 1817 was made, is exhibited. In that suit, Shalley and Gore have both caused themselves to be made defendants—the former praying, in his answer, that the division of 1817 may be consummated, and the latter insisting that it shall be set aside, on the ground that the thirty acres: thereby allotted) to the Churchills was specifically devised to A. W. Hynes, and were not subject to division under the will. From the record of that suit, which is still undetermined, it appears that the division of 1817 was, by consent of parties, approved by the Court, and a decree then made directing conveyances to be executed accordingly; that, in 1825, the commissioner reported that he had made conveyances in pursuance of the decree and division, and had acknowledged and left them for record in the proper counties, but they were not submitted to the Court, and are not exhibited in this record. It appears, however, that this division, though not formally complete, has been acquiesced in ever since.
On the hearing of the present case, the bill was dismissed, and the complainant appeals to this Court, contending that a division of the thirty acres should have been decreed; or that, if not entitled to that, he should have been repaid the cost of procuring the conveyance from E. H. Churchill.
With regard to the division prayed for: it is obvious that the complainant is not entitled to it, unless he has shown that Eliza H. Churchill, under whose conveyance he claims it, had some available interest in the land; nor even then, if it should further appear that the conveyance from her was obtained under such circumstances of fraud and imposition as would make him, in equity, a trustee, holding the title for the benefit of Gore; or such as should induce the Chancellor to refuse his aid for the enforcement, in favor of the grantee, of any equitable right growing out of the deed—whether the thirty acres were devised to A. W. Hynes, or were properly subject to the division of the residuary land, as directed by the will of Andrew Hynes—is a question of great doubt upon the will itself, and the facts applicable to it, as they appear in this record. But, in our view *452 of the present case, that question need not be decided. Waiving, therefore, any discussion of it, and assuming, for the present, that E. H. Churchill had such interest in the land, as might entitle her, or her bona fide vendee, to the aid of the Court—we proceed to enquire into the alleged fraud in the procurement of the deed to Isaac Shalley.
It is evident that John Shalley considered himself as having purchased and paid for the whole thirty acres; that he regarded the whole as his own, and that he believed himself entitled to a conveyance of Eliza H. Churchill’s interest in it, in consequence of his payment and of the bond of her brothers, if not in virtue of any actual obligation binding on herself. Whatever right or interest he had in the land, was transferred to Gore by his deed; and there is no doubt, upon the evidence, that these facts were known to Isaac Shalley, his son. After Gore had acquired his interest, John Shalley went to Miss Churchill to get a deed to himself; and there is some evidence tending to show that Gore had previously used some efforts to induce him to procure it. According to his own statement, Miss Churchill, who said she had received no part of the original purchase money, required fifty dollars to be paid to her before she would convey. And he being unable to make that payment, returned without a deed, and informed his son Isaac that she would convey the land to any body for fifty dollars. Upon which Isaac employed him to purchase the land for him, and for that purpose gave him the fifty dollars, which he paid to Miss Churchill for the land, and other money to pay fees and expenses.
If this statement were true, the employment of John Shalley to make the purchase, when there was no apparent necessity for any intermediate agency, and when it is obvious that the agent chosen had great facilities for imposition, would throw some suspicion on the good faith of the transaction. (Beard et ux vs. Campbell; 2 Marsh. 125.) But the testimony of John Shalley is contradicted in several particulars, and especially with regard to his interview with Miss Churchill; whose evidence on the subject, corroborated, as it is, by that of ano *453 ther witness, we regard as being entitled to entire credit. She states that, on the first visit, John Shalley told her he had sold the land to Gore; that Gore had employed him to come and get her to sign a deed, and that Gore would send her fifty dollars; that, about a week afterwards, he came again, when he paid her the money, and she executed the deed; that, from his representations, she thought he was doing business for Gore, and that she knew nothing of Isaac Shalley. The gentleman at whose house she was then residing, deposes that, when Shalley came first to see her, he told him that he had purchased thirty acres of land in which she had an interest; that he had received a conveyance from her brothers, and their bond that she would release when she came of age; that he had sold the land, and the purchaser wished to get her release. Upon which he informed Miss Churchill of Shalley’s business, and, in answer to her inquiries, told her, that, if she was under obligations to the friends who were bound for her, she ought to release—if not, she should require the full value of the land. He then introduced Shalley to her; and she afterwards told him, she had agreed to release on the payment of fifty dollars.
It seems clear, therefore, that Shalley represented himself, and was understood to be, the agent of Gore, acting for his benefit; and as it appears that Miss Churchill did not know either of the Shalleys before, and there is no reason to suppose that she did know to which of them, by name, the land had been sold by her brothers, or which of them was then before her with the deed, the presumption is strong that she believed that she was executing a deed to the purchaser from her brothers; and there is no doubt that she supposed it to be for the benefit of Gore. Nor can it be doubted that, although the deed purports to be made in consideration of fifty dollars then paid, the fact of the previous purchase and payment by Shalley, and the obligation of her brothers, constituted an operative, if not the principal motive, with Miss Churchill, for the conveyance of the land.
The fifty dollars paid to her was less than one fourth of the price at which her interest was estimated when *454 the original purchase was made; and the fact that she made the conveyance for this small consideration, actually paid to herself, goes far to establish the conclusion that, although not actually bound to comply with the contract of her brothers, that contract and the payment made to them, constituted a great part of the real consideration by which she was induced to execute the deed.
To the benefit of that part of the consideration Gore was entitled, and it was evidently through imposition upon the grantor that the deed, founded mainly upon it, was, in fact, made to one who was a stranger to it. We deem it immaterial to inquire whether Isaac Shalley participated in the fraud; it was practised by his agent, who, in the procurement of the deed, pretended to be the agent of another, and who violated his duty to that other, whether his appointed agent or not. Isaac Shalley claims the benefit of his agent’s fraud’and treachery, and his rights must be affected by the character of the act, in the same manner as if he had practised the imposition in person. If he had presented himself to the maker of the deed as the individual who had made the original purchase and payment, and to whom her brothers were bound for a release of her title; and if, upon the ground of this representation and of the payment of fifty dollars, she had conveyed to him an interest worth over two hundred dollars, he would, on the plainest principles of equity, hold the interest conveyed in trust for the individual whom he had personated, or for his vendee, and could not enforce it against him in a Court of Equity. And this is substantially the present case. For here, the agent of Isaac Shalley pretended to be the agent of Gore, whose interest it was his duty to protect, and in that character, upon the ground of the original purchase, to the benefit of which Gore was entitled, and of fifty dollars paid and received as if from Gore, obtained a deed to his real principal, by inducing the belief, on the part of the grantor, that it was to himself, or at any rate for the benefit of Gore. It is to be observed, also, that the employment of an agent, whose known duty was violated by the agency, and whose relation to *455 the parties gave him peculiar facilities for practising imposition, constitutes, as already intimated, some ground for inferring intentional fraud. Upon the ground, then, that the deed was made upon a consideration, the chief part of which may be regarded as proceeding from Gore, that it was intended for his benefit, and was supposed to be made to his vendor, and that it was made to another, through the fraudulent management of the grantee’s agent, we think it cannot, in a Court of Equity, be used against Gore; and that, if any thing passed by it, he is entitled to have the benefit of it upon equitable terms. The complainant, therefore, was not entitled to a decree for a division of the land, and there was no error in refusing it.
A party, having obtained the legal title to an undivided interest in a tract of land, files his bill for a partition, and for general relief. It appears that he had obtained his title in fraud of the def’t, who was equitably entitled to the whole tract; the comp’s bill was, therefore, properly dismissed. Upon the whole case, however, the complainant is entitled to indemnity for his expenditures in procuring the title, and, upon its being allowed, should be required to transfer his title to the deft. But, the specific prayer of the compt’s bill being refused, can the court decree to him, the cost of his title, without requiring him to transfer it to the def’t ? and can that be done, upon the compt’s bill, where there is no cross bill demanding it, or when the suit on the original bill is heard before, and apart from, the cross bill ?—Upon the deft’s cross bill for the title, there might be a decree for compensation for it, as well as for its transfer: for equity will not compel even a fraudulent grantee to part with a valuable right, without an equitable compensation—especially when the party claiming the right could not have obtained it (if the other had not) without making just compensation to the holder of it.—The comp’t, holding a legal title, might, notwithstanding the dismissal of his bill for partition, evict the def’t, by an action at law, unless prevented by a court of equity, where the comp’t would be compelled to do equity, before he could ask it, by paying his adversary what the title demanded had cost him.—But there being great doubt as to where the legal title rests, but none, that the compt’s grantee had, if not the legal title, at least an available equity, which passed to the comp’t by her deed—upon the supposition that the comp’t had only an equitable title, and that being barred by the dismissal of his bill for a partition, and his right thereby, in effect, secured to the def’t—the def’t might dismiss his cross bill, and leave the comp’t destitute of any means of obtaining indemnity for his advances made in obtaining the title.—The bill and cross bill ought, therefore, to be heard together: and a decree rendered dismissing the claim for partition—but for a transfer of the title, and, e converso, for compensation for it.
Was he entitled to a decree for the fifty dollars, which he paid to E. H. Churchill for the conveyance of her interest? And was it erroneous, upon that ground, to dismiss his bill, without providing for the payment of this sum? On this question we have had great difficulty: principally in determining whether, as he comes into equity asserting right for his own exclusive benefit, under a deed which was obtained in fraud of Gore, and to the benefit of which Gore is equitably entitled, the Court should, or properly could, upon refusing the specific relief asked tor, decree him the cost of ms title, without directing a transfer of it to Gore, and whether such a transfer could or ought to be directed on his bill praying for a division and for general relief. That it *456 might be directed, oil the prayer of the cross bill, and that, in that event, compensation for it might also be decreed on the cross bill, there is no doubt; and this upon the principle, that a court of equity would not, upon the prayer of the defendant, be the instrument of transferring to him a valuable right, even from a fraudulent grantee, without making equitable compensation for it. And this principle would apply with the greater force in this case, because Gore had no means of enforcing a conveyance from Miss Churchill, or of procuring it to himself, without making satisfactory compensation to her, and because she had received nothing for it but the fifty dollars paid by Shalley.
But there is no decree in form upon the cross bill; and regarding the fraudulent grantee merely in the attitude of a complainant, there is a difficulty in granting him any relief. If E. H. Churchill had been invested with the legal title, it would have passed to Isaac Shalley by her deed, and notwithstanding the dismission of his bill for a division, he might have asserted it in an action of ejectment, and Gore must have been evicted, unless he had resorted to a Court of Equity, where he would have been compelled to do equity by paying for Shalley’s title. But if the thirty acres in question were not devised to Alfred Hynes, and were properly taken into the division, in which they were allotted to the Churchills, still, as the legal title never was conveyed to the testator, it did not pass by his will, nor by the division, even if it had been complete, but remains in his executor, to whom it was conveyed after his death, and who was made a defendant by Shalley, for the purpose of procuring the legal title.
Under these circumstances, if Miss Churchill had an equity which could have commanded the legal title to one third of the thirty acres, or which constituted an incumbrance or lien upon it to any extent, and which passed by her deed to her vendee, that equity was in effect extinguished for Gore’s benefit, by the dismissal of the bill; for all means of asserting it are thereby cut off. And as this is, in substance, equivalent to a transfer of it to Gore, who may dismiss his cross bill, and (if *457 the decree stands) may thus evade entirely the equitable principle requiring him to make compensation for the benefit derived from the expenditure of money by Shalley. We are of opinion, on the hypothesis assumed, that, as Gore, in his answer, claims the benefit of Shalley’s purchase, and as the Court has, in effect, given it to him, he should have been required to pay for it. And that, as the cross bill in this case sets up no independent matter, but merely claims the benefit of the complainant’s title, and asks a relinquishment of it, as the means of resisting the relief sought by the original bill, the two bills ought, in propriety, to have been heard together. This not having been done, it is clear that Shalley, if he derived any available equity whatever from E. H. Churchill, has suffered injustice in not being compensated for it by the decree, which virtually deprives him of it — for which injury he has no other remedy but in a reversal of the decree.
Recital of various considerations, from which conclusion is drawn, that if Miss C., compt’s grantor, never had the legal title to the land in controversy, she had an available equity, which, by her conveyance to Isaac Shalley, passed to him; so that he, upon being required to transfer that title to Gore, may have a decree against him, for the sum that it cost.
This conclusion rests upon the assumption that some available interest affecting this land, passed by the deed to Isaac Shalley. On that subject, it is deemed necessary to remark, that, although it be doubtful whether the land in question was not devised to Alfred W. Hynes, and although it were even conceded that, under a proper construction of the will, as applied to the facts now appearing, it would seem probable that the testator intended so to devise it; still the grounds on which a decision to that effect could now be placed, are too uncertain to authorize us to adopt it in behalf of the mere voluntary grantee of Alfred W. Hynes, and in opposition to the practical construction given to the will by the executor and all concerned, at a time when the facts and influences connected with the question were, doubtless, better understood than they now are, and which has been acquiesced in ever since. Under that construction, the division of 1817, in which this land was allotted to the Churchills, was made. That division, though never formally consummated, was approved by the Court having jurisdiction of it, and has never been disturbed. The rights of numerous individuals were adjusted by it; and Alfred W. Hynes, who alone could *458 have been injured by having this thirty acres carried into the general division as undevised land, received and doubtless enjoys, or has disposed of, a larger portion in that division, than if he had successfully claimed this thirty acres as his own, while the Churchills, exclusive of the thirty acres, have received less. From the year 1820, when he arrived at full age, he has made no objection to the division, nor taken any step against it in the suit in which it was made, but has declared that he would not contend for this land. Even in making the deed to Gore, who claimed the whole thirty acres under the Churchills, he evidently did not intend to disturb the allotment of the land to them, but rather to confirm it; and although that deed was designed to operate against Isaac Shalley, to whom E. H. Churchill had conveyed, and so far has the appearance of hostility to her, and of denying her right, yet the fact of making it to Gore, a stranger, without compensation, was itself an implied acknowledgment of his equity, and as that equity was held under a deed purporting to be executed by E. H. Churchill, as well as by her brothers, and which is alleged by Gore, in his answer, to have been executed by her in her infancy, this implied acknowledgment of the equity of Gore’s claim, must be considered as embracing the right of E. H. Churchill, as well as that of her brothers. Her right was, in every respect, the same as theirs; and, whether dependent on the consent of Alfred W. Hynes or not, it constituted, together with theirs, the entire consideration of the conveyance from him to Gore; in making which, he evidently intended nothing more than to select between the claimants under her, and by investing Gore with such title as he had, to protect him, as far as he could, against an act of injustice, the fraudulent character of which, on the part of Shalley, was doubtless represented to him by Gore.
All these circumstances furnish strong evidence against A. W. Hynes, and his grantee, Gore, in favor of the right of E. H. Churchill; and it would seem to be sanctioning an act of injustice on the part of Gore, approximating somewhat in character to that of which he complains in Shalley, if he were permitted to avoid payment, *459 by denying that E. H. Churchill had any available or valuable equity affecting this land, after having obtained the deed from A. W. Hynes, under color of being entitled to that equity. If she had no other equity, she had this at least—that A. W. Hynes could not, consistently with good conscience, reclaim this land from her, while, under the division under which it was allotted to her, he was enjoying a larger, and she a smaller, portion of the residuary lands, than would have been allotted to them respectively, if these thirty acres had been withheld from the division as belonging to him.
But, whatever her right may have been, the land has been held and enjoyed under it ever since 1818, with the consent of all who had any right to dispute it; Gore himself purchased and held under it, and supposed himself to be the owner of it. His claim under it has availed him, as the means of procuring, without other consideration, the only title that could disturb it. E. H. Churchill has never made any valid transfer of it, except to Isaac Shalley; nor received any consideration for it, except the sum of fifty dollars paid by him. It has been worth much more to Gore, when he was not actually entitled to it. He now claims the benefit of Isaac Shalley’s purchase, and has a right to it on equitable terms. Under the circumstances stated, we think equity requires that he should pay the fifty dollars which Shalley gave for it, and which we certainly cannot pronounce to be more than its value.
The decree is, therefore, reversed, and the cause remanded, that a decree may be rendered, on the original and cross bills, in conformity with this opinion.